# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:15cv442-FDW

| | | |
|---|---|---|
| **JOHNTIA LUWANZIEA BARNETTE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **RICHARD L. NEELY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Johntia Barnette's pro se Petition for Writ of Habeas Corpus, 28 U.S.C. § 2254 (Doc. No. 1). Also before the Court are Respondent's Motion for Leave to File Excess Pages (Doc. No. 6) and Motion for Summary Judgment (Doc. No. 8).

## I.      BACKGROUND

Petitioner is a prisoner of the State of North Carolina who was indicted by a Gaston County grand jury for possession with intent to manufacture, sell, and deliver cocaine, felony maintaining a dwelling for keeping and selling controlled substances, possession of drug paraphernalia, and possession of a firearm by a felon. State v. Barnette, 765 S.E.2d 555, 2014 WL 4557600 at *2 (N.C. Ct. App. 2014). Petitioner also was indicted as a habitual felon. (Indictments, Resp't's Ex. 1, Doc. No. 9-2.)

Petitioner was tried by a jury in the Superior Court of Gaston County. The North Carolina Court of Appeals summarized the State's evidence at trial as follows:

> On 6 May 2013, Officer C.A. Cape of the Gastonia Police Department (Officer Cape) stopped a prostitute in possession of a crack pipe. Officer Cape learned that she had purchased crack cocaine from a person named Sweat at Room 122 of the Red Carpet Inn. Officer Cape went to Room 122, and met its occupant, Jomonyak Sanders (Sanders), who consented to a search of the room. The search revealed a

digital scale with crack cocaine residue, and several crack pipes. Sanders told Officer Cape that he had purchased the cocaine from a man called R2 at a house located at 403 North Boyce Street in Gastonia. The second occupant of the room, identified only as a known prostitute, identified R2 as Johntia Barnett [sic] (defendant). Sanders identified the house when he rode past it with Officer Cape. Based upon the statements of Sanders and the unnamed prostitute, Officer Cape obtained a search warrant for 403 North Boyce.

On 5 May 2012,[1] at 11:32 p.m., Officer Cape and other law enforcement officers executed the search warrant. When one of the residents saw and recognized Officer Cape, he slammed the door shut and locked it, requiring officers to use a battering ram to force the door open. Upon entering the house, Officer Cape found five persons in the house, one of whom was the defendant. A search revealed a substance that Officer Cape believed to be crack cocaine, a digital scale, and a .22 caliber rifle. The crack cocaine and scale were in plain view on a kitchen counter, next to a box of plastic baggies. The substance was later confirmed by the North Carolina Crime Lab to be approximately .73 grams of cocaine base, commonly known as crack cocaine.

Officer Cape and his team seized the items, moved them to the kitchen, and asked the persons in the house who owned them. All of the persons denied ownership. When Officer Cape indicated that he would have to arrest everyone, defendant made the statement, "I'll take the charges." Officer Cape further testified that, prior to being taken to jail, defendant stated that "he was residing there because he didn't have anywhere else to stay."

Barnette, 765 S.E.2d at *1 (footnoted added). Prior to trial, Petitioner moved to suppress the evidence seized, asserting that Sanders and the prostitute were not reliable informants and that the warrant, therefore, was not supported by probable cause. Id. at *2. On September 24, 2013, the trial court held an evidentiary hearing on the motion, which it subsequently denied. Id.

On September 26, 2013, Petitioner's jury found him guilty of possession with intent to manufacture, sell, and deliver cocaine, possession of drug paraphernalia, and felony maintaining a dwelling for controlled substances; he was found not guilty of possession of a firearm by a

---

[1] This appears to be a typographical error; these events took place in 2013. (Search Warrant, Resp't's Ex. 10, Doc. No. 9-15.)

felon. Id. Petitioner then pled guilty to habitual felon status. Id. The trial court entered a consolidated judgment, sentencing Petitioner to 72–99 months imprisonment. Id.

Petitioner raised four issues on direct appeal: whether the trial court erred in denying his motion to suppress evidence on the ground that probable cause did not exist for issuance of the search warrant; whether the trial court should have *sua sponte* suppressed Petitioner's incriminating statements to law enforcement for want of Miranda warnings; whether there was substantial evidence to support the charge of maintaining a dwelling for the purpose of keeping or selling controlled substances; and whether there was substantial evidence to support the charge of possession of cocaine with intent to manufacture, sell, and deliver. Barnette, 765 S.E.2d 555 at *2-5. On September 16, 2014, the North Carolina Court of Appeals dismissed the Miranda claim as procedurally defaulted, found no error with respect to Petitioner's other claims, and affirmed Petitioner's judgments. Id.

Petitioner timely filed a Petition for Discretionary Review ("PDR") with the North Carolina Supreme Court, in which he sought review of a single issue -- whether the trial court erred in denying his motion to suppress evidence on the ground that probable cause did not exist for issuance of the search warrant. (PDR, Resp't's Ex. 5, Doc. No. 9-9.) The North Carolina Supreme Court denied discretionary review on June 10, 2015. (Order Den. PDR, Resp't's Ex. 6, Doc. No. 9-10.)

Petitioner filed a timely Motion for Appropriate Relief ("MAR") in the Gaston County Superior Court (Resp't's Ex. 7, Doc. Nos. 9-11, 9-12); it was denied on July 7, 2015 (Order Den. MAR, Resp't's Ex. 8, Doc. No. 9-13). Petitioner filed a Petition for a Writ of Certiorari ("PWC") with the North Carolina Court of Appeals, which was denied on August 7, 2015. (Docket Sheet, State v. Barnette, No. P15-601 (N.C. Ct. App.), Resp't's Ex. 9, Doc. No. 9-14.)

Petitioner filed the instant habeas petition when he signed and placed it in the prison mailbox on September 14, 2015. (Doc. No. 1.) He raises the following claims: Ground One: trial counsel was ineffective for failing to move to suppress Petitioner's incriminating statements to law enforcement in the absence of <u>Miranda</u> warnings; Ground Two: trial counsel was ineffective for failing to interview the named informant who provided information cited in the affidavit submitted in support of the search warrant; and Ground Four: appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim relative to the <u>Miranda</u> issue.[2]

Respondent filed an Answer and a Motion for Summary Judgment on November 25, 2015. (Doc. Nos. 7, 8.) Respondent raises the defense of procedural default with respect to Grounds One and Two. Petitioner filed a Reply to Respondent's Answer (Doc. No. 12) and a Response in opposition to the Motion for Summary Judgment (Doc. No. 14).

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); <u>United States v. Lee</u>, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587–88 (1986). Where, however, the record taken as a whole could not

---

[2] Petitioner originally raised ten grounds for relief. He subsequently filed pleadings waiving review of Ground Three, citing the Supreme Court's holding in <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976) (Pet'r's Reply 17, Doc. No. 12), and voluntarily dismissing Grounds Five and Six (Pet'r's Response 11, Doc. No. 14), Seven, Eight, Nine, and Ten, the last of which he acknowledges merely duplicates Ground Two (Pet'r's Reply, <u>supra</u>, at 23).

lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

**B.  The Antiterrorism and Effective Death Penalty Act of 1996**

Review of Petitioner's claims that were adjudicated on their merits by the state courts is limited by the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 374-91 (2000).  This Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by th[e United States Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]."  Williams, 529 U.S. at 405; Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010) (quoting Williams, 529 U.S. at 405).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case." Williams, 529 U.S. at 407.).  A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

When, as here, the state court does not provide reasons for its denial or dismissal of a petitioner's claim, the federal habeas court must "determine what arguments or theories . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." Richter, 562 U.S. at 102. A petitioner has the burden of establishing that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

**C. Ineffective Assistance of Counsel Under AEDPA**

Claims One, Two, and Four allege ineffective assistance of trial or appellate counsel. In Strickland v. Washington, the Supreme Court identified two necessary components of an ineffective assistance claim. 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, "the defendant must show that the deficient performance prejudiced the defense." Id.

When assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

"[W]hen a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel . . . . [t]he AEDPA standard and the <u>Strickland</u> standard are dual and overlapping, and [the court] appl[ies] the two standards simultaneously rather than sequentially." <u>Lee v. Clarke</u>, 781 F.3d 114, 123 (4th Cir. 2015), <u>as amended</u> (Apr. 15, 2015) (quoting <u>Richardson v. Branker</u>, 668 F.3d 128, 139 (4th Cir. 2012)) (internal quotation marks omitted). Because both standards of review are "'highly deferential' to the state court's adjudication . . . , 'when the two apply in tandem, the review is doubly so.'" <u>Id.</u> (quoting <u>Richardson</u>, 688 F.3d at 139).

## III.    DISCUSSION

### A.  Procedural Default

Respondent contends that Grounds One and Two are procedurally defaulted on federal habeas review because the state court could have invoked an adequate and independent state procedural rule, N.C. Gen. Stat. § 15A-1419(a)(3), to bar consideration of the claims in the state courts. As a general rule, "a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." <u>Burket v. Angelone</u>, 208 F.3d 172, 183 (4th Cir. 2000).

The Gaston County Superior Court summarily denied Petitioner's MAR in its entirety. (Order Den. MAR, Resp't's Ex. 8, Doc. No. 9-13.) It gave the following reason for doing so: "the motion[ ] set[s] forth no probable grounds for the relief requested[.]" (Order, <u>supra</u>.) As stated previously, when the state court issues a summary denial of a prisoner's federal claims, it is presumed to be an adjudication on the merits for § 2254(d)(1) purposes "in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99.

North Carolina law proscribes procedural grounds for denial of an MAR. <u>See</u> N.C. Gen. Stat. § 15A-1419(a). Claims raised in an MAR that could have been raised on direct appeal, but

were not, are subject to dismissal under § 15A-1419(a)(3) (providing for dismissal if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the . . . motion but did not do so").  The Fourth Circuit Court of Appeals has "consistently held that § 15A-1419(a)(3) is an independent and adequate state ground for purposes of procedural default."  Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008).

The Gaston County Superior Court did not cite § 15A-1419(a)(3) or any other procedural ground for denying Petitioner's MAR.  In fact, the court invoked § 15A-1419(a) only as a general bar to any *future* claims Petitioner might attempt to bring by way of an MAR.  (Order, supra.)  It may be accurate, as Respondent argues, that the state court could have barred the challenged claims under § 15A-1419(a)(3).  Cf. State v. Fair, 557 S.E.2d 500, 524 (N.C. 2001) (Ineffective assistance of trial counsel claims "brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing.").  All indications are, however, that the state court did not rely upon a procedural bar to dismiss Petitioner's MAR.  Consequently, Respondent has not overcome the presumption that the state court's summary denial of Petitioner's MAR was an adjudication on the merits.  See Richter, 562 U.S. at 99.

**B.  The Search Warrant**

In Ground Two, Petitioner claims trial counsel was ineffective for failing to interview Jomonyak Sanders prior to filing the motion to suppress the evidence seized during execution of the search warrant.  Had he done so, Petitioner asserts, counsel would have discovered that the affidavit contained false statements that could have been used to secure an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  Petitioner raised this claim in his MAR,

8

which was denied on the merits without an evidentiary hearing.

In Franks v. Delaware, the Supreme Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. 154, 155-56 (1978). At a "Franks hearing," the defendant must prove both that: 1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant," id.; and 2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," id. at 156. If a defendant successfully proves both prongs by a preponderance of the evidence, "the search warrant must be voided and the fruits of the search excluded." Id. North Carolina has codified the rule announced in Franks. See N.C. Gen. Stat. § 15A-978(a).

Officer Cape's affidavit in support of his application for a search warrant states in relevant part:

> Earlier today around 1950 hours I stopped a local prostitute who had a crack pipe on her. While speaking to her I asked where she purchased he [sic] crack and she stated that a guy by the name of "Sweat" sold it to her and he was at the Red Carpet Inn, room 112 on Broadcast st. [sic] I gave her a citation and I went to the Hotel to investigate further.

> Once at the hotel I conducted a knock and talk where the owner of the room, Jomonaka [sic] Sanders, allowed me to do a consent search. After conducting the search I recovered a digital scale with crack cocaine residue on it. Along with several crack pipes. Mr. Sanders then told me that he would be willing to put his name in a search warrant for the residence of the person he bought crack from today. I then read Mr. Sanders his rights and had him sign a rights waiver form before talking further with him. Mr. Sanders then stated that he bought his crack from 403 N Boyce St. from a man by the alias "R2". Mr. Sanders stated that he knows that there is crack cocaine still in the residence. Mr. Sanders described "R2" by stating that he is a tall skinny black male with long dreadlocks and he has a large growth on the side of his face. Mr. Sanders then agreed to ride by the house on N Boyce

and point the residence out to me. Mr. Sanders pointed to and identified 403 N Boyce St. as the house he buys from.

Also inside the hotel room was another locally known prostitute that smokes crack cocaine on a regular basis and can identify crack cocaine. She also stated that she was with Mr. Sanders earlier today when he purchased crack cocaine from 403 N Boyce St. and she confirmed what Mr. Sanders stated that there was crack cocaine inside the residence. I then pulled the residence up on GIS and she confirmed that it was in fact 403 N. Boyce St. via picture.

The subject "R2" was identified by the known prostitute as Johntia Luwonziea Barnette. After pulling his criminal history it showed that he has been charged with several drug violation charges. He is also known to be a violent offender and has been charged with shooting into an occupied dwelling, and assault with a deadly weapon. Mr. Sanders also stated that he knows of at least two firearms that are inside the residence.

(Search Warrant App. 4, Resp't's Ex. 10, Doc. No. 9-15.) The face of the warrant indicates that it was issued on May 6, 2013 at 12:17 a.m. As noted, counsel moved prior to trial to suppress the evidence seized on the grounds that Sanders, a convicted criminal, could not be considered a reliable informant. Barnette, 765 S.E.2d at *2. Sanders did not testify at the suppression hearing. (Hr'g Tr., Sept. 24, 2013, Resp't's Ex. 2A, Doc. No. 9-3.)

At trial, Sanders testified for the State. On direct examination, he stated that on May 6, 2013, he spoke to Officer Cape about purchasing cocaine from Petitioner; prior to May 6, the last time he bought cocaine from Petitioner was "one day that week," and in the six months "prior to that" he had purchased cocaine from Petitioner "about five" times. (Trial Tr. 103, Resp't's Ex. 2B, Doc. No. 9-4.) Sanders also testified that the last time he purchased cocaine from Petitioner, the transaction took place at 403 Boyce Street; Sanders later stated that the transaction took place at 406 Boyce Street. (Trial Tr., supra, at 105.) Sanders testified that the house was "green" and that he had only purchased cocaine once from Petitioner at that address. (Trial Tr., supra, at 105-106.) Finally, Sanders testified that on May 6, 2013, he showed Cape where "the house" was.

(Trial Tr., supra, at 109.)

On cross-examination, Sanders's stated that his contact with Cape occurred on May 5, 2013. (Trial Tr., supra, at 110.) He denied both having purchased cocaine from Petitioner on May 5th and telling Officer Cape that he "bought cocaine from [Petitioner] on May the 5th or May the 6th, 2013." (Trial Tr., supra, at 110-11.) Instead, he claimed he told Cape that he had purchased cocaine at the house earlier that week. (Trial Tr., supra, at 114.) Sanders claimed further that Cape asked him to "make a buy" and that when he refused, Cape asked Sanders to show him where the house was. (Trial Tr., supra at 111.) Moreover, he denied telling Cape that there was cocaine in the house "that day" and testified that Cape threatened to arrest him if there was no cocaine in the house. (Trial Tr., supra, at 112.) He also denied describing the person from whom he bought the cocaine, claiming that it was his "old lady" who described Petitioner and who identified Petitioner from a picture Cape showed her. (Trial Tr., supra, at 112-13.)

On redirect examination, Sanders acknowledged that he could not remember the address on Boyce Street where Petitioner had sold him the cocaine, but he remembered that the house was "green." (Trial Tr., supra, at 125-26.) Sanders also acknowledged that the "known prostitute" with him in the hotel was his "old lady" and that she was with him when he purchased the cocaine from Petitioner at the house on N. Boyce St. (Trial Tr., supra, at 126.) Finally, he denied telling Officer Cape that Petitioner's nickname was "R2," claiming, instead, that Cape told him (Sanders) that Petitioner's nickname was "R2." (Trial Tr., supra, at 124.) Subsequently, he denied that it was Cape who identified "R2." (Trial Tr., supra, at 127.) He also denied telling Cape that there were two guns in the house; instead he claimed to have told Cape that there might be guns in the house. (Trial Tr., supra.)

After Sanders's testimony, defense counsel requested a recess so that he could research

the Franks issue and possibly renew the motion to suppress.  (Trial Tr., supra, at 132-33.)  While observing that there were "some . . . fairly significant and marked" differences between the facts relayed in Cape's affidavit and Sanders's testimony that went "beyond mere differences in interpretation or recollection," the trial court denied the request.  (Trial Tr., supra, at 135, 137.)  The court did, however, state that it would be willing to hear both sides on the Franks issue at the conclusion of the trial, even if it meant postponing sentencing in the event Petitioner was convicted.  (Trial Tr., supra, at 138.)  After the State rested its case, the court inquired whether defense counsel wanted to revisit the Franks issue.  Counsel responded that he would prefer to address it later, stating that he had done "a little research" the previous night "but . . . couldn't find anything really."  (Trial Tr. 312, Sept. 26, 2013, Resp't's Ex. 2C, Doc. No. 9-5.)  Neither the court nor trial counsel raised the Franks issue again.

The Fourth Amendment's requirement of a factual showing sufficient to constitute "probable cause" assumes a truthful showing of facts.  Franks, 438 U.S. at 164–65 (citation omitted).  "Truthful," as intended here, does not mean "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily."  Id. at 165.  "Truthful" in this context means "that the information put forth is believed or appropriately accepted by the affiant as true."  Id.

Before a defendant is entitled to a Franks hearing on the truthfulness of the facts contained in an affidavit, he must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  Id. at 155–56.  A Franks claim is not established, however, "merely by

evidence that contradicts assertions contained in the affidavit, or even that shows the affidavit contains false statements.  Rather, the evidence must establish facts from which the finder of fact might conclude that the affiant alleged the facts in bad faith." State v. Fernandez, 484 S.E.2d 350, 358 (N.C. 1997) (citing State v. Winfrey, 252 S.E.2d 248, 249 (N.C. Ct. App. 1979)).

Because of its summary dismissal, the state court did not identify which of the elements of Petitioner's claim it found insufficient.  Given the trial court's observations about the discrepancies between the affidavit and Sanders's testimony, its willingness to hear both sides on the Franks issue at the trial's conclusion, counsel's initial interest in pursuing the Franks issue, and his subsequent, unexplained failure to revisit the issue (or decision not to) at the trial's conclusion, the Court will assume the state court did not reject this claim because it determined either that a motion for a Franks hearing would not have been granted or that counsel had a strategic reason for not seeking a Franks hearing.  Instead, the Court will address whether the state court reasonably could have concluded Petitioner was not prejudiced by his counsel's failure to pursue a Franks hearing.

For the sake of this analysis, the Court will assume that had a Franks hearing been held, Petitioner would have been able to establish facts from which the state court could have concluded Officer Cape made false statements in bad faith to obtain the warrant.  Petitioner's burden is to demonstrate that "with the affidavit's false material set to one side," it would have been inconsistent with established federal law for the state court to conclude that the remaining content was "[ ]sufficient to establish probable cause" for the magistrate to issue the warrant, Franks, 438 U.S. at 156.  See Richter, 562 U.S. at 102.

"Probable cause for a search is present where facts are stated which establish reasonable grounds to believe a search of the premises will reveal the items sought and that the items will

aid in the apprehension or conviction of the offender." <u>Fernandez</u>, 484 S.E.2d at 358 (citing

<u>State v. Arrington</u>, 319 S.E.2d 254, 256 (N.C. 1984)). "If an informant . . . is the source of

information, the affidavit must recite 'some of the underlying circumstances from which the

informant concluded' that relevant evidence might be discovered, and 'some of the underlying

circumstances from which the officer concluded that the informant[] . . . was credible or his

information reliable.'" <u>Franks</u>, 438 U.S. at 165 (quoting <u>Aguilar v. Texas</u>, 378 U.S. 108, 114

(1964)). Under North Carolina law, "the fact that an informant was named and identified in a

search warrant affidavit provides a magistrate with enough information to permit him to

determine the informant to be reliable." <u>Barnette</u>, 765 S.E.2d at *2 (citing <u>State v. Eason</u>, 402

S.E.2d 809, 814 (N.C. 1991)). Thus, the information provided to Officer Cape by Jomonyak

Sanders is presumptively reliable under North Carolina law. <u>See</u> <u>id.</u>

"The task of the issuing magistrate is to make a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him, including the 'veracity'

and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability

that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462

U.S. 213, 238 (1983) (quoting <u>Jones v. United States</u>, 362 U.S. 257, 362 (1960)). "[T]he duty of

a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

conclud[ing]' that probable cause existed." <u>Id.</u> at 238-39 (quoting <u>Jones</u>, 362 U.S. at 362).

Here, the undisputed facts contained in Officer Cape's affidavit are that on May 5 or 6,

2013,[3] Cape stopped a known prostitute for possession of a crack pipe; she had purchased the

---

[3] It is not clear from the record whether the events in question occurred on May 5, 2013, May 6, 2013, or both. Officer Cape testified that the search warrant was executed at 11:32 p.m. on May 5, 2013 (Trial Tr. 145, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.), the same day he spoke with Jomonyak Sanders at the Red Carpet Inn (Search Warrant App. 4, Resp't's Ex. 10, Doc. No. 9-15). The magistrate recorded that the warrant was sworn on May 6,

crack cocaine in the pipe from Sanders, who was residing in a room at the Red Carpet Inn. On the same day, Cape went to that hotel room and found Sanders and tools of the cocaine trade – a digital scale with crack cocaine residue and crack pipes – in the room. Sanders told Cape he had purchased the cocaine at 403 N. Boyce St. Another locally-known prostitute, who also smoked crack cocaine, was with Sanders when Cape arrived at the hotel room. She had accompanied Sanders to 403 N. Boyce St. to purchase the cocaine. The prostitute asserted that there was cocaine still at that residence. Sanders rode with Cape to N. Boyce St. and identified a "green" house, No. 403, as the residence where he had bought the cocaine. Sanders identified the person from whom he purchased the cocaine at the residence as "R2."[4] The prostitute with Sanders identified "R2" as Petitioner. Cape reviewed Petitioner's criminal record and found that he had several drug charges.

The state court reasonably could have concluded that this set of facts was sufficient for an issuing magistrate to infer that Sanders purchased cocaine from Petitioner at 403 N. Boyce St. the same day he spoke to Cape or relatively close to that date. Likewise, the state court reasonably could have determined that these facts provided a "substantial basis" for a magistrate to conclude "there was a fair probability" crack cocaine, other evidence of a crime, and Petitioner would be found at 403 N. Boyce St. See Gates, 462 U.S. at 238-39 (citation omitted). In short, "fairminded jurists" could disagree that a determination by the state court that there was

2013 and issued at 12:17 a.m. on May 6, 2013. (Search Warrant, supra.) Sanders's testimony about his encounter with Officer Cape shifted between May 5 and May 6, 2013. (Trial Tr., supra, at 103, 109, 110.) None of the other officers involved in the execution of the search warrant specified whether it was executed on May 5 or 6. (Trial Tr., supra, at 186, 211, 237.)

[4] Sanders's testimony regarding whether he told Cape he had bought the crack from someone called "R2" was contradictory. (Trial Tr. 124, 127, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.) Sanders also testified he told Cape that he had purchased cocaine from Petitioner but denied identifying Petitioner. In light of Sanders's conflicting testimony, the Court finds no reason to assume the state court would have concluded Cape made this statement in bad faith.

probable cause for the magistrate to issue the warrant even if the contested portions of Officer Cape's affidavit were set aside would be inconsistent with <u>Franks</u>, <u>Gates</u>, et. al. <u>See Richter</u>, 562 U.S. at 102.

Thus, Petitioner has failed to demonstrate that there is a reasonable probability he would have been successful at a <u>Franks</u> hearing in having the warrant voided and the evidence suppressed. <u>See Strickland</u>, 466 U.S. at 694. Consequently, he cannot show that the state court's rejection of his ineffective assistance of counsel claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

### C. Petitioner's Incriminating Statements

In Ground One, Petitioner claims that trial counsel was ineffective for failing to move to suppress incriminating statements Petitioner while in custody. In Ground Four, Petitioner claims that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel rendered ineffective assistance by not moving to suppress the statements.

When it rejected Petitioner's MAR, the state court did not reveal which of the elements in these multipart claims it found insufficient. As with the previous claim, it is the task of this Court to determine "what arguments or theories . . . could have supported[ ] the state court's decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. <u>Richter</u>, 562 U.S. at 102.

When an ineffectiveness claim is based on counsel's failure to file a motion to suppress, demonstrating that "an unfiled motion would have had 'some substance,'" is sufficient "to call into question counsel's performance." <u>Grueninger v. Dir., Virginia Dept. of Corrections</u>, 813

F.3d 517, 524–25 (4th Cir. 2016) (quoting <u>Tice v. Johnson</u>, 647 F.3d 87, 104 (4th Cir. 2011)). To demonstrate prejudice, the petitioner is required to show "(1) that the motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial." <u>Grueninger</u>, 813 F.3d at 525 (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986); <u>Tice</u>, 647 F.3d at 104, 107–08).

The record shows that Officer Cape and at least five other officers executed the search warrant. (Trial Tr. 145, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.) As the officers were gathered on the porch of the residence, but before they had announced their presence, one of the occupants of the house opened the front door, saw Cape, slammed the door, and locked it. <u>Barnette</u>, 765 S.E.2d at *1. The officers then used a battering ram to force the door open. <u>Id.</u> After entering the residence, the officers located all of the occupants – three men, including Petitioner, a woman, and a young child; the officers handcuffed the adults and seated all of the occupants in the living room while they searched the house. (Trial Tr., <u>supra</u>, at 147-48, 188, 195-96; 227.) Plastic baggies of what appeared to be crack cocaine and a digital scale were in plain view on the kitchen counter. (Trial Tr., <u>supra</u>, at 149.) Officer Cape asked the occupants, as a group, to whom the crack cocaine belonged. (Trial Tr., <u>supra</u>, at 172.) When all of the occupants denied ownership, Cape stated that he would have to arrest everyone. (Trial Tr., <u>supra</u>, at 173-74.) At that point, Petitioner stated that he would "take the charges." (Trial Tr., <u>supra</u>, at 153.) Petitioner was arrested; prior to being taken to jail, he stated that he was living at the house because he "didn't have anywhere else to stay." (Trial Tr., <u>supra</u>, at 153.)

With his MAR, Petitioner filed an affidavit in which he swore that he was not advised of his <u>Miranda</u> rights before making the statements attributed to him. (MAR Att. 1, Resp't's Ex. 7, Doc. No. 9-11.) Petitioner also stated in his affidavit that in addition to threatening to arrest

everyone in the house if no one claimed the cocaine, Cape threatened to call Social Services to take the child. (Barnette Aff., supra.) When questioned at trial about whether he or any other officer threatened to call Social Services, Cape testified that such a statement probably was made, but he did not recall making it himself or which of the other officers may have made it. (Trial Tr. 172-73, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.)

The Self–Incrimination Clause of the Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." United States v. Mashburn, 406 F.3d 303, 306 (4th Cir. 2005) (quoting Missouri v. Seibert, 542 U.S. 600, 608 (2004) (plurality opinion)) (internal quotation marks omitted). "Statements obtained in violation of Miranda are admissible only in narrow circumstances." Mashburn, 406 F3d at 306 (citing Oregon v. Elstad, 470 U.S. 298, 307 (1985) (holding that statements obtained in violation of Miranda are irrebuttably presumed involuntary "for purposes of the prosecution's case in chief"); New York v. Quarles, 467 U.S. 649, 655–57 (1984) (establishing a narrow public safety exception to Miranda); Harris v. New York, 401 U.S. 222, 226 (1971) (holding that voluntary statements obtained in violation of Miranda are admissible on cross-examination for purposes of impeachment)).

Whether a suspect was "in custody" for purposes of receiving Miranda warnings, depends upon whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "Whether a suspect is 'in custody' is

an objective inquiry. 'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'"

J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted)). Facts relevant to the custodial inquiry include, but are not limited to,

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant[,]. . . . the suspect's isolation and separation from family, . . . and [the use of ] physical restrictions.

United States v. Hashime, 734 F.3d 278, 283 (4th Cir. 2013) (citations and internal quotation marks omitted.)

"Custodial interrogation" refers to "express questioning or its functional equivalent."

Rhode Island v. Innis, 446 U.S. 291, 301 (1980). "That is to say, the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. (footnote omitted). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id.

Petitioner cannot succeed on either ineffectiveness claim without demonstrating that there was a violation of his Miranda rights. There being no evidence to the contrary, or any dispute by Respondent, the Court accepts as true Petitioner's assertion that he was not advised of his Miranda rights at any point prior to being taken to jail. See Barnette, 765 S.E.2d at *3 ("There was no evidence that defendant was advised of his Miranda rights prior to making these

statements.").

### 1. Petitioner's First Incriminating Statement

When Cape asked about the drugs' ownership, Petitioner was handcuffed, and seated with other handcuffed adults, while at least six officers were present in the house.  The officers had used force to enter the house; their purpose was to execute a search warrant for illegal drugs, and they had found what appeared to be illegal drugs in plain view.  There is no evidence that Petitioner was told that he was not under arrest when he was handcuffed or that use of the handcuffs was for his and the officers' safety.  Cape threatened to arrest Petitioner, along with everyone else, if no one acknowledged owning the drugs.  Based upon that threat, a reasonable person in Petitioner's position would have expected to be arrested, whether he confessed to owning the drugs or not.  The Court concludes that under these circumstances, there would be no disagreement among fairminded jurists that a reasonable person in Petitioner's position would not have felt free to "terminate the interrogation and leave," Thompson, 516 U.S. at 112.

Cape expressly questioned the group of adults when he asked who owned the drugs, and his question was designed to evoke an incriminating answer.  Moreover, pairing that question with a threat to arrest everyone if no one confessed is the type of psychological ploy Cape should have known was reasonably likely to elicit an incriminating response.  See Innis, 446 U.S. at 301.  In other words, it was reasonably likely that a handcuffed suspect, in a home where drugs had been found in plain view by police, who had forcefully entered the home, would feel that he was being coerced to incriminate himself when told that everyone, including a partially disabled man and the mother of the small child, would be arrested on drug charges if no one confessed. See id. at 300 ("'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.") (footnote omitted).

The Court concludes that, if the state court rejected Petitioner's claim on the grounds that his statement was not obtained in violation of Miranda, there would be no disagreement among fairminded jurists that the state court's holding was inconsistent with those of Miranda, Mathiason, Behteler, Innis, et al. See Richter, 562 U.S. at 102. By extension, if the state court rejected Petitioner's ineffective assistance of trial counsel claim on the grounds that a motion to suppress the statement pursuant to Miranda would have been denied, there would be no disagreement among fairminded jurists that the state court's holding was inconsistent with Strickland. See id.

### 2. Petitioner's Second Incriminating Statement

Petitioner was placed under arrest before he told Cape he was living at 403 N. Boyce St. (Trial Tr. 153, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.) Therefore, there is no question that Petitioner was "in custody" for Miranda purposes when he made that statement. There is insufficient evidence in the record to determine if Petitioner simply volunteered that information or responded to a question about his address. For the sake of argument, the Court will assume that Petitioner responded to a direct question about his residency.

Under Innis, the question posed to Petitioner regarding his residence constituted custodial interrogation. See Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality opinion) (rejecting argument that questions gathering suspect's biographical information did not constitute custodial interrogation). In Muniz, however, the Supreme Court recognized an exception to Miranda's coverage for routine booking questions securing "biographical data necessary to complete booking or pretrial services." 496 U.S. at 601 (citation omitted). In a footnote, the Muniz Court stated that "[r]ecognizing a 'booking exception' to Miranda does not mean, of course, that any question asked during the booking process falls within that exception. Without

21

obtaining a waiver of the suspect's <u>Miranda</u> rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." <u>Id.</u> at 601 n.14 (citation and internal quotation marks omitted). Among the biographical data recognized as reasonably related to police administrative concerns are a suspect's "name, address, height, weight, eye color, date of birth, and current age." <u>Id.</u> at 601-02.

In this case, because Cape's question about Petitioner's residence came after Petitioner's arrest, it may have been for the purpose of gathering routine biographical information necessary to process an arrestee. If so, it would have been one of several other biographical questions asked, and a reasonable person in Petitioner's situation would not have felt he was being coerced into incriminating himself by answering those questions. <u>See</u> <u>Innis</u>, 446 U.S. at 300. Even if Cape's purpose in asking about Petitioner's address or residence was for the purpose of seeking incriminating information,[5] Petitioner would have been asked for the same information during the course of his processing at the jail, as that is the type of biographical information reasonably related to those institutions' administrative concerns, and, therefore, outside <u>Miranda</u>'s coverage. <u>See</u> <u>e.g.</u> <u>Rosa v. McCray</u>, 396 F.3d 210, 221 (2d Cir. 2005) ("Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of <u>Miranda.</u>") (citations omitted).

The Supreme Court has not expounded upon its statement in <u>Muniz</u> that "[w]ithout obtaining a waiver of the suspect's <u>Miranda</u> rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." <u>Id.</u> at 601 n.14 (citation and

---

[5] Petitioner was convicted of felony maintaining a dwelling for keeping and selling controlled substances. The North Carolina Court of Appeals has held that "a defendant's statement that he resided at a particular place 'was substantial evidence that defendant maintained the dwelling.'" <u>Id.</u> (quoting <u>State v. Spencer</u>, 664 S.E.2d 601, 605 (N.C. Ct. App. 2008)).

internal quotation marks omitted).  Nor has it addressed a situation where officers intentionally elicited "biographical" or "pedigree" information for the purpose of obtaining incriminating admissions, but the same information was later gathered solely for administrative purposes during the routine booking process.  Therefore, it would not have been unreasonable for the state court to conclude that notwithstanding Cape's purpose in asking Petitioner where he lived or whether he resided at 403 N. Boyce St., Petitioner's response did not have to be suppressed under <u>Miranda</u>, because the information would eventually have to be given during the booking process.  <u>See</u> <u>e.g.</u>, <u>United States v. Edwards</u>, 885 F.2d 377, 384–85 (7th Cir. 1989) (concluding that Edwards's responses to officer's request for his name, address, and place of employment during the course of an arrest did not have be suppressed under <u>Miranda,</u> in part because such questions would eventually be asked during booking).

Consequently, if the state court's decision rested on a conclusion that, under these circumstances, Petitioner's statement that he was living at 403 N. Boyce St. was not obtained in violation of <u>Miranda</u>, fairminded jurists could disagree that such a decision was inconsistent with the holdings of <u>Miranda</u>, <u>Innis</u>, <u>et al</u>.  <u>See</u> <u>Richter</u>, 562 U.S. at 102.  "Fairminded jurists" likewise could disagree that a determination by the state court that trial counsel did not render ineffective assistance by failing to move to suppress this statement under <u>Miranda</u> would be inconsistent with <u>Miranda</u> and <u>Strickland</u>.  <u>See</u> <u>Richter</u>, 562 U.S. at 102.

### 3.   Ineffective Assistance of Counsel

The only thing remaining for the Court to determine is whether a conclusion by the state court that Petitioner was not prejudiced by the admission at trial of his first incriminating statement constituted an unreasonable application of <u>Strickland</u>.  <u>See</u> <u>id.</u>  The standard before the state court was whether there was a "reasonable probability" of a different outcome at trial had

Petitioner's statement that he would "take the charges" been excluded.  See Strickland, 466 U.S. at 694.

Petitioner was charged with possession of cocaine with intent to manufacture, sell, and deliver and possession of drug paraphernalia.  Because the drugs and paraphernalia were not found on Petitioner's person, the State was required to prove that Petitioner had "constructive possession" of the drugs and paraphernalia.  "Constructive possession . . . occurs when a person lacks actual physical possession, but nonetheless has the intent and power to maintain control over the disposition and use of the [controlled] substance."  Barnette, 765 S.E.2d at *5 (citation and internal quotation marks omitted).  To obtain a conviction for maintaining a dwelling for the purpose of keeping or selling controlled substances, "the State has the burden of proving a defendant: (1) knowingly or intentionally kept or maintained; (2) a building or other place; (3) being used for the keeping or selling of a controlled substance."  Barnette, 765 S.E.2d at *4 (citing N.C. Gen. Stat. § 90-108(a)(7) and quoting State v. Fuller, 674 S.E.2d 824, 832 (N.C. Ct. App. 2009) (internal quotation marks omitted)).

Sanders testified that he had purchased cocaine from Petitioner in the kitchen at 403 N. Boyce St.  Sanders had known Petitioner for at least a decade.  Cape testified that Sanders told him Petitioner lived at 403 N. Boyce St.  (Trial Tr. 185, Sept. 25, 2013, Resp't's Ex. 2B, Doc. No. 9-4.)  Petitioner was found at 403 N. Boyce St. when the search was executed.  Crack cocaine and paraphernalia of a kind associated with the sale of drugs were found in the kitchen at 403 N. Boyce St.  Cape testified Petitioner admitted he was living at the residence.  Cash totaling $260.00 was found in Petitioner's pocket during the search.  (Trial Tr., supra, at 223-24, 249.)

Sanders testimony that he had purchased cocaine from Petitioner the same week the search was executed, combined with the presence of crack cocaine in separate plastic baggies

next to the digital scale, was evidence that the sale to Sanders either was not an isolated transaction or was not intended to be an isolated transaction. Cape's testimony that Petitioner admitted living at the residence was additional evidence that Petitioner had been maintaining a drug trade at the house prior to execution of the search warrant. The large amount of cash found in Petitioner's pocket was additional evidence that the cocaine and paraphernalia belonged to him, not one of the other adults in the house. Finally, other than their presence in the house at the time the search was executed, no evidence was introduced linking any of the other adults to the possession of, or control over, the cocaine.[6]

To demonstrate prejudice resulting from counsel's deficient representation, it is not enough to show "that the errors had some conceivable effect on the outcome of the proceeding," Strickland, 466 U.S. at 693, or that "it is possible a reasonable doubt might have been established if counsel acted differently," Richter, 562 U.S at 111. Instead, "Strickland asks whether it is 'reasonably likely' the result would have been different," and the "likelihood of a different result must be substantial, not just conceivable." Id. at 111–12. It is certainly conceivable that had Petitioner's statement that he would "take the charges" been suppressed, the outcome of his trial would have been different. The Court concludes, however, that "fairminded jurists" could disagree that a state court determination that there was not a substantial likelihood of a different result was inconsistent with the Supreme Court's holding in Srickland. See Richter, 562 U.S. at 102. Consequently, Petitioner's ineffective assistance of trial counsel claim fails.

Petitioner's Ground Four fails for the same reasons. In the context of a claim of

---

[6] No evidence was presented at trial that cash, weapons, or anything else associated with the drug trade was found on any of the other adults in the house. It is, of course, possible that more than one adult was involved in selling drugs out of the house. That possibility does not change the evidence against Petitioner.

ineffective assistance of appellate counsel, the "proceeding" at issue is the forum in which the petitioner's appeal was heard, which in this case, was the North Carolina Court of Appeals. See Smith v. Robbins, 528 U.S. 259, 285–86 (2000) (holding, in the context of an ineffective assistance of appellate counsel claim, that the "prejudice" element of the Strickland standard is satisfied by a showing of a reasonable probability defendant would have prevailed on appeal but for appellate counsel's deficient performance). Under Strickland's "prejudice" prong, as applied simultaneously with AEDPA's deferential standard of review, Petitioner must demonstrate that the state court unreasonably concluded that he failed to demonstrate there was a "reasonable probability" the North Carolina Court of Appeals would have held in his favor had his appellate counsel raised the ineffective assistance of trial counsel issue on direct appeal. See Richardson, 668. F.3d at 140. For the reasons cited in its analysis of Petitioner's ineffective assistance of trial counsel claim, the Court concludes Petitioner has failed to demonstrate that the state court's rejection of his ineffective assistance of appellate counsel claim "was so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." See Richter, 562 U.S. at 103.

VI.    **CONCLUSION**

For the reasons stated herein, Petitioner has waived review of, or voluntarily dismissed, Grounds Three, Five, Six, Seven, Eight, Nine, and Ten of his habeas Petition. Grounds One, Two, and Four, were decided on their merits by the state post-conviction court and are not procedurally defaulted here.

Petitioner has failed to demonstrate that the state post-conviction court's rejection of the claims raised in Grounds One, Two, and Four was "so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  See id.  Therefore, Petitioner is not entitled to relief under 28 U.S.C. § 2254; the Petition shall be denied, and Respondent shall be granted summary judgment.

V.    **ORDER**

**IT IS, THEREFORE, ORDERED** that:

1.  The Petition for Writ of Habeas Corpus, 28 U.S.C. § 2254 (Doc. No. 1) is **DENIED**;

2.  Respondent's Motion for Leave to File Excess Pages (Doc. No. 6) is **GRANTED**;

3.  Respondent's Motion for Summary Judgment (Doc. No. 8) is **GRANTED**; and

4.  Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**SO ORDERED.**

Signed: August 8, 2016

Frank D. Whitney
Chief United States District Judge

27